UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| **GELI WALLEY**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **Case No.** |
| | ) |
| **YORK HOSPITAL,** | ) |
| | ) |
| Defendant | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff GELI WALLEY, by and through the undersigned counsel, hereby complains against Defendant as follows:

**INTRODUCTION**

1. This is an action for violation of the Federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (hereinafter "EMTALA"), based on the failure to stabilize, treat, admit, or appropriately transfer Plaintiff when she presented to the Defendant's emergency department on March 23, 2016.

**THE PARTIES**

2. Plaintiff GELI WALLEY is an individual residing in the Town of York, County of York, and State of Maine.

3. Defendant YORK HOSPITAL is a Maine nonprofit corporation organized, existing, and conducting business in the State of Maine, with a principal place of business at 15 Hospital Drive in York, Maine.

4. Upon information and belief, YORK HOSPITAL is a "participating hospital" within the meaning of EMTALA, because it has entered into a provider agreement with the Center for Medicare and Medicaid Services ("CMS") under the Medicare statute, 42 U.S.C. § 1395cc.

## JURISDICTION AND VENUE

5. The Court has original Federal subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Plaintiff resides and Defendant conducts business in this district. Further, a substantial part of the events or omissions alleged herein occurred in this judicial district.

## STATUTORY REQUIREMENTS UNDER EMTALA

7. The Federal EMTALA statute, 42 U.S.C. § 1395dd, was enacted by Congress in 1986 to ensure that the general public could obtain emergency services as needed, without regard for the ability to pay.

8. Under EMTALA, whenever an individual presents to a "dedicated emergency department" of a participating hospital for treatment, that hospital must provide an appropriate medical screening examination, without delay, to determine whether an emergency medical condition exists.

9. YORK HOSPITAL is a dedicated emergency department within the meaning of EMTALA and its regulations found at 42 C.F.R. § 489.24.

10. EMTALA defines "emergency medical condition" as: "A medical condition manifesting itself by acute symptoms of sufficient severity," including severe pain, "such that the absence of immediate medical attention could reasonably be expected to result in – (i) Placing

the health of the individual . . . in serious jeopardy; (ii) Serious impairment to bodily functions; or (iii) Serious dysfunction of any bodily organ or part."

11. In order to comply with EMTALA, a hospital's screening examination must be reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provide that level of screening to all those who present with substantially similar complaints.

12. When a hospital prescribes internal procedures for a screening examination, those internal procedures must be followed.

13. If an emergency medical condition is found to exist, EMTALA requires a participating hospital to provide necessary treatment to stabilize the emergency medical condition, without delay, or to arrange for an appropriate transfer of the individual to another hospital capable of treating the patient's condition.

14. The above obligations under EMTALA apply regardless of whether the individual presenting to the emergency department is a Medicare beneficiary.

15. An individual has been "stabilized" under EMTALA if, with respect to her emergency medical condition, "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility."

## FACTS ESTABLISHING A VIOLATION OF EMTALA

16. On March 23, 2016, Plaintiff Geli Walley was going out to dinner in Kittery, Maine when she exited the car and experienced sudden weakness and blurriness in her left eye.

17. Ms. Walley tried to stand on her right leg, but it went completely numb and she fell to the ground, disoriented.

18. Ms. Walley recognized that she was having a stroke and asked to be driven to YORK HOSPITAL. She had slurred speech and troubling moving her right hand en route to the hospital.

19. Ms. Walley presented to the Emergency Department ("ED") of YORK HOSPITAL around 8:00 pm on March 23, 2016.

20. YORK HOSPITAL immediately initiated an acute stroke protocol and ordered a non-contrast CT scan of the head.

21. Shortly after Ms. Walley arrived in the ED, YORK HOSPITAL had her sign a form stating that she would be placed in "Outpatient Observation" status, rather than admitted as an inpatient.

22. Under EMTALA, the placement of a patient in outpatient observation status does not eliminate an ED's obligations to provide an appropriate screening examination or stabilizing treatment.

23. The results of Ms. Walley's CT scan, which ruled out intracranial hemorrhage and showed no evidence of acute infarct, were called in to the ED attending physician at 9:05 pm.

24. At the time Ms. Walley's CT scan results were called in to YORK HOSPITAL's ED excluding an intracerebral hemorrhage, she was last known well within the past 3 hours.

25. YORK HOSPTIAL failed to stabilize Ms. Walley by giving her intravenous tissue plasminogen activator ("tPA").

26. YORK HOSPITAL did not prescribe any medication for Ms. Walley while she was in the ED.

27. Ms. Walley does not have any contraindications against the use of tPA in acute stroke patients.

28. By 9:30 pm, still within three hours of when she was last known well, Ms. Walley continued to experience partial visual hemianopia, and right leg drift, as well as continuous headache and dizziness.

29. Ms. Walley's stroke symptoms improved, but did not entirely resolve, after she presented to the ED.

30. Around 10:00 pm, while she was still in "outpatient observation" status, Ms. Walley suffered a recurrence of her stroke symptoms, which lasted for approximately 15-20 minutes, with right sided hand clenching, and leg and arm weakness "similar to her initial complaint."

31. Upon information and belief, YORK HOSPITAL is not a Joint Commission certified primary or comprehensive stroke center.

32. YORK HOSPITAL was not capable of treating Ms. Walley's persistent stroke symptoms.

33. When Plaintiff's stroke symptoms recurred on March 23, 2016, it should have been clear to YORK HOSPITAL that Plaintiff required urgent transfer to a primary stroke center capable of assessing whether she was a candidate for endovascular therapies or other treatment for ischemic stroke.

34. Instead of transferring Ms. Walley to a stroke center capable of treating her persistent symptoms, Ms. Walley's primary care physician, Dr. James Gilroy, admitted her to York Hospital on March 23, 2016 at 11:03 pm, and entered an order for an MRI/MRA of the brain.

35. Although Dr. Gilroy entered admission orders on March 23, 2016 at 11:03 pm, he did not complete Ms. Walley's admission history and physical until the morning of March 25,

2016, when the Assessment and Plan was: "Stroke, with fluctuating symptoms." Dr. Gilroy noted that Ms. Walley continued to show "slightly decreased finger appositions R," as well as ongoing headache.

36. Ms. Walley's admitting diagnosis was "trans cerebral ischemic attack uns."

37. Dr. Gilroy did not order a stat MRI/MRA of the brain at the time of admission, even though Ms. Walley had persistent stroke symptoms.

38. Ms. Walley's MRI/MRA of the brain was performed on March 24th for "acute stroke symptoms"; the results showed an acute ischemic infarct/stroke in the watershed area of the brain "between the ACA and MCA."

39. The results of the MRI/MRA were called into Dr. Gilroy at 1:00 pm on March 24, 2016, which was more than 16 hours after Ms. Walley presented to the ED of YORK HOSPITAL with acute stroke symptoms.

40. During the time that she was in "outpatient observation" status at YORK HOSPITAL, Ms. Walley did not receive full and appropriate medical screening examinations to determine the severity of her emergency medical condition, or whether transfer to a primary stroke center was necessary.

41. Ms. Walley's MRI/MRA on March 24th showed an "apparent absent flow-void in the distal extracranial portion of the left ICA, just proximal to the petrosal segment, which I suspect may be artifactual, as flow appears to be normal just proximal distal to the area. A CT angiogram could be performed for more complete evaluation, however."

42. By the time YORK HOSPITAL received the results of Plaintiff's MRI/MRA on March 24th, Defendant knew that Ms. Walley was likely suffering from left internal carotid artery stenosis, which required urgent transfer to a receiving hospital capable of providing

endovascular therapies or other treatment for ischemic stroke.

43. Ms. Walley had a neurology consult with Dr. Pantcho Maslinski following her MRI/MRA on March 24, 2016, which confirmed "acute stroke in the left frontoparietal area," likely due to "embolic phenomena." Dr. Maslinski recommended a carotid Doppler study, 2D echo with bubble, and telemetry, but his consultation note does not mention the option of transferring Plaintiff to a primary stroke center.

44. On March 25, 2016 at 7:57 am, Dr. Gilroy entered an order with a priority level of "routine," for a CT angiogram of Ms. Walley's neck, with contrast.

45. By that time, Ms. Walley had been told she would be discharged from YORK HOSPITAL.

46. In the middle of the day on March 25, 2016, YORK HOSPITAL performed a CT angiogram of Ms. Walley's neck and found a possible dissection injury of her left internal carotid artery, which warranted further evaluation.

47. In addition, the CT angiogram showed "occlusion or a high grade stenosis at the level of the petrous portion of the left internal carotid artery."

48. The above CT angiogram results were called in to Dr. Gilroy at 2:45 pm and reviewed with consulting neurologist Dr. Maslinksi in person.

49. After Dr. Gilroy received the results of Ms. Walley's CT angiogram at 2:45 pm on March 25, 2016, he did not arrive at YORK HOSPITAL to discuss Plaintiff's treatment plan for approximately three hours.

50. On the day in question (March 25, 2016), Dr. Gilroy was either going on or returning from vacation.

51. Once Dr. Gilroy arrived at YORK HOSPITAL on March 25, 2016, he signed an

order to transfer her to Beth Israel Deaconess Medical Center in Boston, Massachusetts ("BIDMC").

52. On March 25, 2016 at 7:00 pm, Dr. Gilroy's patient transfer order stated that Plaintiff needed: "further evaluation of LIC abnormality, possible stenting." Dr. Gilroy checked off: "Obtain level of care not available at this facility."

53. Ms. Walley had another stroke while waiting at YORK HOSPITAL to be transferred to BIDMC.

54. Due to Plaintiff's ongoing unstable condition, she could not make the trip to Boston and YORK HOSPITAL instead transferred her to Maine Medical Center.

## COUNT I
## VIOLATION OF EMTALA

55. Plaintiff repeats the allegations contained in Paragraphs 1 through 54 of her Complaint as if fully set forth herein.

56. When Ms. Walley presented to YORK HOSPITAL on March 23, 2016, she was suffering from an emergency medical condition within the meaning of EMTALA.

57. YORK HOSPITAL failed to provide an appropriate medical screening examination of Plaintiff's stroke symptoms in a timely manner, in violation of EMTALA.

58. YORK HOSPITAL failed to stabilize Plaintiff's emergency medical condition in a timely manner, in violation of EMTALA.

59. YORK HOSPITAL failed to admit Plaintiff within a reasonable amount of time, in violation of EMTALA.

60. YORK HOSPITAL failed to transfer Plaintiff to a primary stroke center capable of treating her ongoing stroke symptoms in a timely manner that could have prevented another stroke.

61. As a direct and proximate result of YORK HOSPITAL's violation of EMTALA, Plaintiff has suffered damages.

62. YORK HOSPITAL's conduct in violation of EMTALA was so outrageous that malice may be implied.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant on Count I and order YORK HOSPTIAL to pay her compensatory and punitive damages, together with interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff GELI WALLEY hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated:   March 22, 2018            */s/ Laura H. White*

                                                              _____
                                                              Laura H. White, Bar No. 4025
                                                              *Attorney for Plaintiff*
                                                              BERGEN & PARKINSON, LLC
                                                              62 Portland Rd., Suite 25
                                                              Kennebunk, ME 04043
                                                              (207) 985-7000
                                                              lwhite@bergenparkinson.com