# UNITED STATES DISTRICT COURT

# DISTRICT OF MAINE

| | | |
|---|---|---|
| GELI WALLEY, | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL NO. 2:18-CV-126-DBH |
| | ) | |
| YORK HOSPITAL, | ) | |
| DEFENDANT | ) | |

## DECISION AND ORDER ON MOTION TO DISMISS

The issue presented by this 12(b)(6) motion is whether the plaintiff's one-count Complaint has stated a claim under the Federal Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd et seq., as opposed to an ordinary medical malpractice claim under Maine state law. I conclude that she has failed to state a federal claim and **GRANT** the defendant's motion to dismiss.

### FACTS

I take the facts as stated in the plaintiff's complaint, as well as any concessions the parties have made. The defendant York Hospital is a participating hospital with a dedicated emergency department within the meaning of EMTALA. Compl. ¶¶ 4, 9 (ECF No. 1). For purposes of its motion, York Hospital admits that it is covered by EMTALA and that it operates an emergency department. Def.'s Mot. 4 n.3 (ECF No. 5).

The plaintiff came to the Hospital's Emergency Department around 8:00 p.m. on March 23, 2016, believing that she was having a stroke. Compl. ¶¶ 18-19. (York Hospital admits that the plaintiff came to the hospital on March 23, 2016, seeking treatment. Def.'s Mot. 4 n.3.) She was formally admitted to the hospital at 11:03 p.m. with a stroke diagnosis, namely, "trans cerebral ischemic attack uns." Compl. ¶¶ 34-36. On the evening of March 25, 2016, York Hospital transferred her to Maine Medical Center. Compl. ¶¶ 52, 54; Pl.'s Opp'n 5 (ECF No. 6). The plaintiff had another stroke before she was transferred. Compl. ¶ 53.

## ANALYSIS

This court, the First Circuit, and the Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) have repeated time and again that EMTALA is not a medical malpractice statute. See, e.g., Ramos-Cruz v. Centro Medico del Turabo, 642 F.3d 17, 18 (1st Cir. 2011) (it "is a limited anti-dumping statute, not a federal malpractice statute."); Correa v. Hosp. San Francisco, 69 F.3d 1184, 1193 (1st Cir. 1995); Feighery v. York Hosp., 59 F. Supp. 2d 96, 102 (D. Me. 1999); Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions, 68 Fed. Reg. 53222, 53223 (Sept. 9, 2003) ("In enacting [the private right of enforcement in EMTALA], Congress did not intend for the statute to be used as a Federal malpractice statute."). Instead, Congress enacted EMTALA to stop so-called hospital "dumping" practices by which some hospitals denied admission to patients who lacked insurance or ability to pay. Congress did not create the federal law to

supersede state law on medical malpractice.[1] Fraticelli-Torres v. Hosp. Hermanos, 300 F. App'x 1, 3-4 (1st Cir. 2008); Bryan v. Rectors & Visitors of Univ. of Virginia, 95 F.3d 349, 351-52 (4th Cir. 1996); Feighery, 59 F. Supp. 2d at 102 (collecting cases). I assess the Complaint in that framework.

This one-count Complaint asserts that York Hospital's treatment of the plaintiff violated EMTALA as follows: (1) The Hospital failed to provide an appropriate medical screening examination of her stroke symptoms in a timely manner; (2) it failed to stabilize her emergency medical condition in a timely manner; (3) it failed to admit her within a reasonable amount of time; and (4) it failed to transfer her in a timely manner to a primary stroke center. Compl. ¶¶ 57-60. York Hospital's motion seeks to dismiss the entire Complaint and argues that EMTALA permits a cause of action founded upon only (1) failure to provide an appropriate screening and (2) transferring her without first stabilizing her condition, *i.e.*, the first two assertions. Def.'s Mot. 3-4. The plaintiff's response implicitly accepts this characterization of her Complaint, argues that her first two assertions are sufficient to state a claim, and does not address the last two. Pl.'s Opp'n 2. The first two, therefore, are the claims that I assess.[2] Because the plaintiff has not argued that her federal cause of action survives even if I rule in the Hospital's favor on the first two claims, I conclude that she is not pursuing the other two as separate federal claims. In any event, the

---

[1] The statute specifies that it does "not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section."  42 U.S.C. § 1395dd(f).
[2] I need not decide whether York Hospital correctly characterizes EMTALA as limited to these two obligations on the part of hospitals. These are the only two that are relevant as the case is pleaded.

3

plaintiff has not shown that they are independent EMTALA violations as opposed to ordinary medical malpractice claims.[3]

I choose to address in reverse order the two claims in dispute.

***Failure to Stabilize***

EMTALA provides that when a hospital determines that an individual has an emergency medical condition, it "must provide . . . such treatment as may be required to stabilize the medical condition" or "transfer [her] to another medical facility." 42 U.S.C. § 1395dd(b)(1). There are special conditions for transferring a patient who has not been stabilized, so as to avoid the "dumping" that EMTALA sought to end. Id. § 1395dd(c). CMS has promulgated the following regulation regarding the stabilization requirement:

> If a hospital has screened an individual . . . and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section [concerning the obligation to stabilize] with respect to that individual.

42 C.F.R. § 489.24(d)(2)(i). The regulation also states: "If the hospital admits the individual as an inpatient for further treatment, *the hospital's obligation under this section ends,* as specified in paragraph (d)(2) of this section." Id.

---

[3] I discuss the delayed admission claim *infra* at note 11. As for the late transfer assertion, the First Circuit has said: "A hospital's negligent medical decision not to transfer a critical patient promptly to another hospital to receive necessary treatment might trigger state-law medical malpractice liability, but it could not constitute an EMTALA anti-dumping violation." Fraticelli-Torres, 300 F. App'x at 7. Even if the complaint is read loosely to allege not a late transfer but an "inappropriate" transfer in violation of 42 U.S.C. § 1395dd(c), that claim would be foreclosed in this case by the CMS regulations, discussed in text, that terminate EMTALA obligations— including compliance with § 1395dd(c)—once an individual has been admitted as an inpatient in good faith. 68 Fed. Reg. at 53245 ("[T]ransfer and stability issues for [an] individual, once he or she is admitted [as an inpatient], would [not] be governed by . . . EMTALA requirements.").

4

§ 489.24(a)(1)(ii) (emphasis added). The plaintiff acknowledges in her Complaint that York Hospital did admit her as an inpatient on March 23, 2016; the Complaint does not allege that the Hospital was not acting in good faith in doing so.[4] Under this regulation, then, York Hospital had no EMTALA stabilization obligation, although it may have had state law medical malpractice obligations. York Hospital explicitly relied upon this regulation in both its Motion and its Reply. The plaintiff in her opposition simply did not address the regulation.[5]

CMS has given this regulatory interpretation of the EMTALA stabilization requirement considerable attention. First, in 2002, recognizing a difference of opinion among courts, CMS proposed applying the stabilization requirement to inpatients who were admitted in order to stabilize their emergency medical conditions. Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates, 67 Fed. Reg. 31404, 31475 (May 9, 2002).[6] After extensive negative public comments, and consideration of

---

[4] In her legal memorandum, the plaintiff argues that bad faith is unnecessary, Pl.'s Opp. 10, but the regulation speaks of admitting "an inpatient in good faith." 42 C.F.R. § 489.24(d)(2)(i). She also argues that a jury could find that her hospital admission was a subterfuge, and could infer bad faith. Pl.'s Opp. 10. And her Complaint states in its final paragraph that "YORK HOSPITAL's conduct in violation of EMTALA was so outrageous that malice may be implied." Compl. ¶ 62. That assertion seems to be directed to her claim for punitive damages. In any event, I conclude that she must actually allege subterfuge or the absence of good faith on the Hospital's part under the strictures of Fed. R. Civ. P. 11 in order to avoid the regulation's treatment of inpatients.

[5] In her argument about stabilization, the plaintiff relies upon Lopez-Soto v. Hawayek, 175 F.3d 170, 174-75, 177 n.4 (1st Cir. 1999). But that case predated the CMS regulation. First Circuit stabilization cases decided after the regulation was adopted have not needed to address the duration of the stabilization requirement. See, e.g., Alvarez-Torres v. Ryder Mem. Hosp., Inc., 582 F.3d 47, 51-52 (1st Cir. 2009) (holding that there was no federal stabilization obligation for a patient who was admitted but not transferred). In Fraticelli-Torres, 300 F. App'x at 3-4, the court noted that the plaintiff there contended that the duty of stabilization continued even after admission (citing Lopez-Soto) and that the defendants did not dispute the contention, but the court was not called upon to decide the issue or address the CMS regulation.

[6] CMS was prompted to do so after the issue came up in the context of Roberts v. Galen of Virginia, Inc., 525 U.S. 250 (1999). The Solicitor General advised the Court during the course of Galen that CMS "would develop a regulation clarifying its position on th[e] issue." 67 Fed. Reg.

the federal case law, however, CMS in 2003 adopted the version now in effect, 68 Fed. Reg. 53222, that the stabilization obligation is satisfied and *ends upon patient admission* so far as a federal remedy is concerned. 42 C.F.R. § 489.24(a)(1)(ii), (d)(2)(i). CMS reexamined the issue in 2012 and after considering additional public comment decided to leave the regulation as it stands. Medicare Program; Emergency Medical Treatment and Labor Act (EMTALA): Applicability to Hospital Inpatients and Hospitals With Specialized Capabilities, 77 Fed. Reg. 5213 (Feb. 2, 2012).[7]

I have not found any First Circuit case that addresses the inpatient regulation. The "vast majority" of cases outside the First Circuit have followed it. Thornhill v. Jackson Par. Hosp., 184 F. Supp. 3d 392, 399 (W.D. La. 2016) (collecting cases). In Moses v. Providence Hosp. and Med. Ctrs., Inc., 561 F.3d 573, 583 (6th Cir. 2009), the Sixth Circuit refused to apply it, finding it contrary to the plain language of the statute, but the Sixth Circuit's refusal is arguably dictum because the regulation was not promulgated until after that plaintiff's hospital stay. Id. at 583-84. In any event, the plaintiff here has not challenged the validity of the regulation and, in the absence of argument, I do not engage in the conventional Chevron[8] analysis of whether the statute is ambiguous and whether this is a permissible interpretation.[9] I simply apply the regulation, as

---

at 31475. Galen did not decide the issue, holding only that, to recover under § 1395dd(b), a plaintiff need not prove that a hospital acted with an improper motive in failing to stabilize her.
[7] The Solicitor General apparently advised the Court in 2010 that CMS "had committed to initiating a rulemaking process to reconsider" the inpatient exception; the rulemaking began in December of that year. 77 Fed. Reg. at 5216.
[8] Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).
[9] I do note that at this point, the Sixth Circuit's conclusion is an outlier.

the "vast majority" of cases have done. On the facts she alleges in her Complaint, the plaintiff has no *federal* cause of action for failure to stabilize.

***Appropriate Medical Screening***

EMTALA also provides that a hospital emergency department "must provide for an appropriate medical screening examination . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a).

On the issue of appropriate medical screening, the First Circuit has said:

> A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints. *The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly.*

Correa, 69 F.3d at 1192 (1st Cir. 1995) (emphasis added) (citations omitted). The Circuit immediately added:

> EMTALA does not create a cause of action for medical malpractice. Therefore, a *refusal* to follow regular screening procedures in a particular instance contravenes the statute, but *faulty* screening, in a particular case, as opposed to *disparate* screening or *refusing* to screen at all, does not contravene the statute.

Id. at 1192-93 (emphasis added) (citations omitted). The plaintiff here has not asserted that York Hospital refused to follow regular screening procedures or that it had no screening procedures. She also has not asserted that York Hospital engaged in disparate screening or that it refused to screen her at all.[10]

---

[10] In her legal memorandum, the plaintiff cites Repp v. Anadark Mun. Hosp., 43 F.3d 519, 522 (10th Cir. 1994), for the point that a hospital's failure to follow its own standard screening procedure violates the federal screening requirement. Pl.'s Opp'n 8. I observe that in Cruz-

Instead, the plaintiff acknowledges that York Hospital *did* recognize her emergency medical condition and "did in fact ***initiate*** an appropriate screening examination." Pl.'s Opp'n 2 (citing Compl. ¶¶ 20, 23). Her Complaint says that when she arrived, "York Hospital immediately initiated an acute stroke protocol." Compl. ¶ 20. But she argues that ultimately her screening was not "full and appropriate," Compl. ¶ 40, and that whether she "ultimately received an 'appropriate screening examination' within the meaning of EMTALA is a factual question that can only be answered by a medical expert." Pl.'s Opp'n 2-3.

I agree that the quality of the screening examination the plaintiff received may indeed be a factual and expert question, but it raises Maine medical malpractice law issues, not a federal EMTALA claim for *refusing* to screen or *disparate* screening. Under this District's and this Circuit's caselaw, the plaintiff's Complaint does not state a federal claim for failing to provide appropriate medical screening.[11]

---

Vazquez v. Mennonite Gen. Hosp., Inc., 717 F.3d 63 (1st Cir. 2013), the First Circuit said that "[w]hen a hospital prescribes internal procedures for a screening examination, those internal procedures set the parameters for an appropriate screening." Id. at 69 (cleaned up). But the Complaint nowhere alleges that York Hospital failed to satisfy that standard of following its own procedures. The legal memorandum also says that the screening examination "was unreasonably delayed in violation of hospital protocol," Pl's Opp'n 8, but the *Complaint* does not include that allegation about York Hospital protocol.

[11] The plaintiff does state in her legal memorandum that "a hospital's delay in screening a patient is actionable under § 489.24(d)(4)." Pl.'s Opp'n 8 (ECF No. 6). What that regulation states is that:

> A participating hospital may not delay providing an appropriate medical screening examination . . . *in order to inquire about the individual's method of payment or insurance status.*

42 C.F.R. § 489.24(d)(4)(i) (emphasis added). The regulation follows 42 U.S.C. § 1395dd(h), which has similar language. But the Complaint does not allege that York Hospital delayed her screening examination for such a purpose. See also Matta-Rodriguez v. Ashford Presbyterian Comm. Hosp., 60 F. Supp. 3d 300, 310 (D.P.R. 2014) (charge of "untimely" screening is not sufficient; must charge refusal to screen or a screening inconsistent with regular screening procedures).

8

## CONCLUSION

I express no view on whether the plaintiff's stroke treatment at York Hospital amounts to medical malpractice under Maine law. What I conclude is that her allegations do not state a *federal* claim under EMTALA, a federal statute designed to end some hospitals' practice of turning away patients who needed care. "Congress did not intend EMTALA to supplant existing state-law medical malpractice liability with a federal malpractice standard of care; the minimal screening and stabilization requirements were designed solely to prevent the specific injury of patient 'dumping,' which state malpractice law often could not redress." Fraticelli-Torres, 300 F. App'x at 4 (citation omitted).

The defendant's motion to dismiss is **GRANTED**.

**SO ORDERED.**

**DATED THIS 27ᵀᴴ DAY OF JULY, 2018**

/s/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**